# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                           Case No. 04-CR-264

ERIC RAMOS,

    Defendant.

## RECOMMENDATION TO CHIEF UNITED STATES DISTRICT JUDGE RUDOLPH T. RANDA

### NATURE OF THE CASE

On November 9, 2004, a federal grand jury sitting in this district returned a one-count indictment against the defendant, charging him with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On February 11, 2005, the defendant appeared before this court for arraignment and entered a plea of not guilty. Pursuant to the pretrial scheduling order issued at that time, the defendant has filed a motion to suppress evidence. (Docket # 11).

The defendant asserts that the search of a garage at 1017 S. 38th Street, Milwaukee, Wisconsin on October 9, 2004, was not conducted pursuant to a search warrant or with his consent in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution. He further maintains that Merrisa Trease was not authorized to consent to the search on his behalf, nor did she give such consent. The government opposes the defendant's motion to suppress which will be addressed herein.

On March 21, 2005, the court conducted the first part of an evidentiary hearing on the defendant's motion to suppress. The evidentiary hearing was continued on March 29, 2005. Prior to the evidentiary hearing, the parties stipulated to certain undisputed facts.

At the initial hearing, Detective Brian Hardrath, a detective with the Milwaukee Police Department (MPD), Violent Crimes Division, testified on behalf of the government. At the continued hearing, MPD Detective John Karlovich testified for the government and Merissa Ramos testified for the defendant. Based upon the testimony and evidence adduced at the hearing, as well as the facts stipulated to by the parties, the court makes the following findings of fact and recommendation for the disposition of the defendant's motion to suppress.

### **Findings of Facts**

At approximately 3:00 a.m. on October 9, 2004, City of Milwaukee police officers were called to St. Francis Hospital regarding an emergency room patient, Eric Ramos, the defendant in this case. He was being treated for a gunshot wound to his leg. The defendant was initially interviewed by Milwaukee Police Department Officers Daniel Urban and Alex Ayala. The defendant told the officers that he resided at 8801 South 84th Street in Franklin, Wisconsin. He also told the officers that he had been shot by an unknown subject near 14th Street and Lincoln Avenue in Milwaukee, Wisconsin, when he stepped out of his car to urinate. More specifically, the defendant stated that when he was standing outside of his car, he heard three or four shots fired. When he got back inside of his car, he realized that he had been shot.

Merrisa M. Trease was interviewed by MPD Officers Ayala and Urban at the hospital. She identified herself as the girlfriend of the defendant. The parties dispute what Ms. Trease told the officers. According to Detective Hardrath, Ms. Trease told the officers that the defendant had been shot near 14th Street and Lincoln Avenue by an unknown subject as they

were dropping a friend off at her home and the defendant was walking the friend to her door. Detective Hardrath testified that Ms. Trease told the officers that after she heard three or four gunshots, the defendant ran back to the car and she noticed blood on his pants.

According to Ms. Trease, when she was interviewed by the uniformed officers, she gave them an address of 8929 West Waterford Square North. After speaking to the officers for about five minutes, she left the hospital to get something to eat. The police officers had told her to wait at the hospital, but she left. Mr. Trease denied telling the officers at the hospital that she heard shorts fired at 14th Street and Lincoln Avenue. She said that her mother heard shots at the 1017 South 38th Street address and called her on her cell phone. According to Ms. Trease, her mother and brother live at the 1017 South 38th Street address, which is a duplex. One of the units is empty. Ms. Trease testified that she lived at 8801 South 84th Street in Franklin, Wisconsin, with the defendant and his parents. She also denied ever telling the officers that she saw a gun in the defendant's hand or heard the defendant say, "I shot myself."

After speaking with Ms. Trease, Officers Urban and Ayala checked the area of 14th and Lincoln Avenue and found no evidence of a shooting. The officers conducted a criminal history check on the defendant which revealed that he is a convicted felon.

MPD Detectives John Karlovich and Brian Hardrath went to St. Francis Hospital and spoke with Officers Urban and Ayala. The detectives inspected the pants that the defendant had been wearing at the time that he was shot and observed a bullet hole surrounded by a burn mark which, in their opinion, was consistent with a gun being fired at extremely close range. Based on the information provided by Ms. Trease to the officers, Detectives Karlovich and Hardrath went to the Waterford Square address, which was part of an apartment complex, and spoke with someone there. No one at that address knew Ms. Trease.

- 3 -

Case 2:04-cr-00264-RTR   Filed 05/09/05   Page 3 of 12   Document 26

The detectives returned to St. Francis Hospital and spoke to Ms. Trease who had come back to the hospital to get the defendant. The detectives asked Ms. Trease why she had left. They also asked her what happened and where she lived. The detectives spoke to Ms. Trease because the story she had initially told the officers did not appear to be consistent with the defendant's injuries. They told her that they did not believe her story.

Detective Hardrath obtained background information from Ms. Trease. At that time, Ms. Trease did not appear to be under the influence of drugs or alcohol and did not have any difficulty in understanding the questions posed to her. Detective Hardrath testified that Ms. Trease told the detectives that she lived at 1017 South 38th Street. She previously mentioned the address of 8929 West Waterford Square North, but the detectives told her that they had been there and that she did not live there.

Ms. Trease acknowledged that she had been untruthful about the events of the shooting. She told the detectives that she had seen the defendant with a gun in his hand following the shooting. Ms. Trease also told the detectives that she believed the defendant may have put the gun in "her garage" at the rear of her residence at 1017 South 38th Street. The detectives never told Ms. Trease that she could not leave.

The detectives asked Ms. Trease to accompany them to the garage. She agreed to go with them. Ms. Trease was not in custody at the time. The detectives and Ms. Trease traveled to the garage at 1017 South 38th Street in an unmarked squad. Ms. Trease was in the rear passenger seat and Detective Hardrath was driving the vehicle. During the ride to the garage, Ms. Trease had a calm demeanor and was cooperative. No promises were made to her.

When they arrived in the area, Detective Hardrath drove in from the back alley to the garage and parked the squad car in the back near the alley. The garage contains three

- 4 -

separate stalls, each with its own overhead door. The garage doors face the alley. There were no separate numbers distinguishing between the three separate garage doors. Ms. Trease identified the door furthest to the north as "her garage." Detective Hardrath did not have any conversation with Ms. Trease about her use of the garage, nor did the detectives attempt to contact anyone at the residence before Detective Karlovich entered the garage. Ms. Trease advised the detectives that the defendant owned the residence. He had purchased it the prior year.

Detective Hardrath testified that he asked Ms. Trease for permission to search the garage and she said, "yes." He also testified that no promises were made to Ms. Trease to obtain her consent, nor did she suggest in any way that the garage was not hers. Detective Hardrath did not ask Ms. Trease to sign a consent form agreeing to the search. According to Detective Karlovich, he asked Ms. Trease for the keys to open the garage door and she told him that the garage was already open.

Ms. Trease had a different recollection of what transpired at the garage. Ms. Trease testified that she went with the MPD detectives to the garage at 1017 South 38th Street because she did not believe she had a choice. She said the detectives had raised their voices to her when they returned from the Waterford Square North address. Ms. Trease said that she had been at the garage before because the defendant parked his car in that garage.

Ms. Trease testified that the detective in the passenger seat got out of the vehicle when they arrived at the garage and looked around. One of the detectives asked her how they could get into the garage and she replied that they could not because the garage was locked. She told them that the defendant had the keys. Ms. Trease said that she did not see who opened the garage or how the garage was opened.

- 5 -

Detective Karlovich testified that when he approached the garage door, he found that the door was not locked and he was able to open it. He entered the garage. Officer Ayala arrived on the scene in his own vehicle and went inside the garage with Detective Karlovich. Detective Karlovich was inside the garage about a minute or two before he located the gun. He then called for a photo car to take photographs of the gun. Detective Hardrath did not get a good look at the interior of the garage. It appeared to Detective Hardrath, that Detective Karlovich only searched one stall. According to both detectives, Ms. Trease never suggested that it was not her garage or that the garage was locked and that the defendant had the keys.

After the search of the garage was completed, the officers returned to St. Francis Hospital. Ms. Trease walked toward the residence at 1017 South 38th Street.

Ms. Trease testified that before she and the defendant went to the hospital they stopped at the garage at 1017 South 38th Street. She did not recall telling the detectives that the defendant got out and went into the garage and that he was in the garage for about one minute. After the defendant exited the garage, Ms. Trease said that she and the defendant went to St. Francis Hospital. Ms. Trease knew that the defendant was a convicted felon.

Ms. Trease also testified that she had no key to the garage lock and had no property in the garage at the time. She said that no one uses the garage and that only the defendant has access to it. She had never let anyone into the garage. She further testified that her mother and brother use a section of the three stall garage, but they did not have keys. Only the defendant had keys to the garage. Ms. Trease testified that the lock on the stall which Detective Karlovich searched on October 9, 2004, was not broken at that time. The photograph in Exhibit 4 taken after October 9, 2004, depicts a broken lock on the door to that stall.

Ms. Trease testified that she did not want the officers to know where she lived and that she had lied to the police. She knew that she could get into trouble for lying to the police.

According to Ms. Trease, she did not write the affidavit which was signed by her and submitted in support of the defendant's motion to suppress evidence. (Affidavit of Merrisa Ramos[1] [Ramos Aff.] ¶ 1). She acknowledged that she skimmed the affidavit and signed it under oath. In the affidavit, she avers that she told the detectives that she lived at "1019 S. 38th Street, West Milwaukee, Wisconsin," but that she did not actually live at that address. Id.

She avers that she told the officers that the defendant had been shot in that area. Ms. Trease further avers that her mother and brother were allowed to use one stall in the garage and that the defendant used two stalls. According to Ms. Trease, no one asked her if they could go into the garage, but that she saw "the police officers open one of the garage doors and enter the garage." (Ramos Aff. ¶ 4).

## **ANALYSIS**

In moving to suppress the evidence obtained by law enforcement officers, the defendant contends that the search of the garage violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution because the search of the garage was not conducted pursuant to a search warrant or upon his consent. He further asserts that Ms. Trease was not authorized to consent to the search of the garage on his behalf, nor did she give such consent.

---

[1] Ms. Trease and the defendant were married sometime after October 9, 2004.

In response, the government contends that the officers obtained consent to search the garage. They further maintain that even if Ms. Trease did not have actual authority to consent to the search, she had apparent authority to do so.

Warrantless searches are per se unreasonable under the Fourth Amendment, but are subject to specific exceptions. Mincey v. Arizona, 437 U.S. 385, 390 (1978); United States v. Robles, 37 F.3d 1260, 1263 (7th Cir. 1994). One exception to the Fourth Amendment prohibition against warrantless searches permits law enforcement officers conducting a search to enter when voluntary consent is obtained either from the individual whose property is searched or from a third party who possesses common authority over the premises. See Illinois v. Rodriguez, 497 U.S. 177, 186 (1990); United States v. Saadeh, 61 F.3d 510, 517 (7th Cir. 1995); United States v. Rosario, 962 F.2d 733, 736 (7th Cir. 1992) (citing Schneckloth v. Bustamonte, 412 U.S. 218 [1973] and United States v. Matlock, 415 U.S. 164 [1974]); see also, Florida v. Jimeno, 500 U.S. 248 (1991).

The standard for measuring the scope of an individual's consent under the Fourth Amendment "is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251; Rodriguez, 497 U.S. at 188 ("[D]etermination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment , , , "warrant a man of reasonable caution in the belief"' that the consenting party had authority over the premises?" [quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)]); see also, United States v. Dorsey, 27 F.3d 285 (7th Cir. 1994).

Consent searches are valid only if the consent was freely and voluntarily given. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). To determine the voluntariness of a consent, the court must inquire whether, under the totality of the circumstances, law

- 8 -

enforcement officers have overborne the will of the accused. Haynes v. State of Wash., 373 U.S. 503, 513-14 (1963); Schneckloth, 412 U.S. at 226.

A person's knowledge of his right to refuse is not a prerequisite of a voluntary consent. Schneckloth, 412 U.S. at 234. Thus, the subject of a Fourth Amendment search need not be aware of the right to refuse to give knowing and voluntary consent. Lenz v. Winburn, 51 F.3d 1540, 1548 (11th Cir. 1995); see also, Schneckloth, 412 U. S. at 234, 249. Where a consent is obtained from a third party, the government bears the burden of proof by a preponderance of the evidence that the consenting third party possessed such authority. Rodriguez, 497 U.S. at 181.

Apparent authority can also provide a sufficient basis for consent. See Rodriguez, 497 U.S. at 188-89. The Court in Rodriguez affirmed the constitutionality of a warrantless entry based on the consent by a third party whom the police, at the time of the search, reasonably believed to have common authority over the premises, even though the person in fact did not possess such authority. Id. The factors to consider when making an objective determination of whether a person has apparent authority are by necessity the same factors that make up actual authority. United States v. Miller, 800 F.2d 129, 134 (7th Cir. 1986). To determine whether there is apparent authority, "one must look for indicia of actual authority." Rosario, 962 F.2d at 737 (quoting United States v. Miller, 800 F.2d at 134).

In Rodriguez, the police had gained access to the defendant's apartment with the assistance of a woman who had described the apartment as "our[s], stated that she kept clothing and furniture at the apartment, unlocked the door with her key and granted the officers permission to enter." Id. at 180. However, she and her two children had moved out almost a month before the search at issue, taking all their clothes, and had gone to live with the woman's mother. A few items of furniture were left at the defendant's apartment. Although

- 9 -

the woman stayed at the defendant's apartment at times after she moved out, she never went to the apartment when the defendant was not home and never invited her friends there. She had taken a key to the defendant's apartment without his knowledge. On these facts, the Court found that the state had not established that the woman had joint access or control for most purposes. However, the court held that her representations nonetheless furnished an adequate basis for the police to believe she had authority to permit the search of the apartment. Id. at 188-89.

In this case, Detective Hardrath testified that Ms. Trease told the detectives that she lived at 1017 South 38th Street, although Ms. Trease testified that only her mother and brother lived at that address. She referred to the garage behind the residence as "her garage." Ms. Trease also denied giving the officers consent to search the garage at the residence. She testified that she told the detectives that the garage was locked and the defendant had the only keys.

Upon consideration of the evidence of record, the court finds the testimony of Detectives Hardrath and Karlovich more credible than the testimony of Ms. Trease. Ms. Trease not only gave the officers an erroneous home address of 8929 West Waterford Square North, she admitted that she lied to the officers about the circumstances of the shooting. She falsely told them that the defendant had been shot by an unknown person near 14th Street and Lincoln Avenue as the defendant was walking their friend to the door of her home. She also submitted a false affidavit in support of the defendant's motion in which she averred that she told the detectives that she lived at 1017 South 38th Street, but that she actually did not live there.

Her hearing testimony also contradicted her sworn affidavit. At the hearing, she stated that she told the detectives the garage was locked when they asked her about going into the

Case 2:04-cr-00264-RTR    Filed 05/09/05    Page 10 of 12    Document 26

garage. In her affidavit, she stated no one asked her if they could enter the garage. Furthermore, although Ms. Trease averred that she saw one of the officers open one of the garage doors and enter the garage, she testified at the hearing that she did not see who opened the garage or how it was opened.

Given the material inconsistencies in her testimony and affidavit, the court finds the testimony of the detectives to be more credible. According to the detectives, Ms. Trease told them she lived at 1017 South 38th Street and that before going to the hospital, she and the defendant stopped at the garage at the residence, which she referred to as "my garage." She told the detectives that the defendant went inside the garage briefly. Ms. Trease also told the detectives that the defendant may have put a gun in "her garage." When the detectives went to the garage of what Ms. Trease said was her residence, they asked for and she gave them permission to search. At the conclusion of the search, Ms. Trease walked towards the residence at 1017 South 38th Street and the detectives left the area.

Even if this court concluded that Ms. Trease did not have actual authority to consent to the garage search, the detectives had reasonable grounds to believe that she had common authority over the garage. Ms. Trease told the detectives that she lived at 1017 South 38th Street. In her affidavit, she confirmed that she told the detectives she lived at that address. Ms. Trease also told them that she went to "her garage" at that residence with the defendant before taking him to the hospital for a gunshot wound. She accompanied the detectives to "her garage" and voluntarily gave the detectives consent to search it. When Detective Karlovich asked her for the keys to open the garage, Ms. Trease said it was already open. Detective Karlovich then went to the garage and opened the unlocked door. After a brief search, he located the weapon.

- 11 -

Case 2:04-cr-00264-RTR   Filed 05/09/05   Page 11 of 12   Document 26

Thus, Ms. Trease's representations to the detectives provided a sufficient basis for them to believe that she had authority to permit the search of the garage. Rodriguez, 497 U.S. at 188-189. Accordingly, this court will recommend to Chief United States District Judge Rudolph T. Randa that the defendant's motion to suppress be denied. (Docket # 11).

## **CONCLUSION**

**NOW, THEREFORE, IT IS RECOMMENDED** that Chief United States District Judge Rudolph T. Randa enter an order **denying** the defendant's motion to suppress. (Docket # 11).

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin, this 9th day of May, 2005.

BY THE COURT:

s/Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge

- 12 -

Case 2:04-cr-00264-RTR   Filed 05/09/05   Page 12 of 12   Document 26